[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13564
Non-Argument Calendar
_____

D. C. Docket No. 05-10015-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BURTRAM JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 11, 2007)**

Before DUBINA, CARNES and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Burtram Johnson appeals his convictions and 24-month

sentence for obstruction of justice, making false statements to a grand jury, and making false statements to the United States. After review, we conclude that the evidence at trial was sufficient to sustain Johnson's convictions on all counts. We also conclude that the district court, in calculating Defendant Johnson's advisory guidelines range, did not err in imposing a 3-level increase under U.S.S.G. § 2J1.3(b)(2) on the basis that Johnson's perjury resulted in substantial interference with the administration of justice.

## I. BACKGROUND

This case arises out of false statements made by Defendant Johnson during the course of an investigation of Jeffrey Balch for violations of the Clean Water Act. Because Johnson raises sufficiency of the evidence issues, we first summarize the evidence at trial.

### A. Balch's Illegal Fill Activity

In 1990, Balch purchased some property in Marathon, Florida, which was located on the Gulf of Mexico in an area known as Florida Bay and included two acres of "bay bottom" land. Balch decided to develop a commercial dock on the property. In 1994, Balch applied for a joint permit from the Florida Department of Environmental Regulation ("DER") and the United States Army Corps of Engineers ("USACE") to build the dock. Balch obtained a permit from the

2

USACE,[1] but he had difficulty obtaining the requisite permits from the state DER and other state and local authorities.

Balch eventually hired Defendant Johnson, who resided in California, as a consultant to help with the permitting difficulties that Balch had been having. After Defendant Johnson had reviewed Balch's documents, Johnson advised Balch that he had been applying to the wrong agency, and that, because he owned the bay bottom, Balch "could do what [he] wanted with it."

On November 13, 2001, Balch entered into an agreement with Felix Equities ("Felix"), a contractor who had surplus dirt, or fill, from an excavation project it was performing in Marathon, to dump its extra fill on Balch's property. According to Balch, Defendant Johnson was aware of this agreement because Balch and Johnson "talked all the time. . . . sometimes three or four times a week." Once Felix began delivering the fill, Balch first spread out the fill across his property in order to fill in any holes and level out any dips and bumps on the land.

Around the end of December 2001, Balch began pushing the fill into the water and onto his bay bottom. Balch discussed with Defendant Johnson the legality of his actions, and Johnson had a "very strong opinion" that Balch had the right to do what he wanted with his bay bottom. Balch continued pushing fill into

---

[1]The USACE permit did not contemplate that Balch's project would require dredging and filling.

the water through March 2002, during which time he had regular contact with Johnson.

On February 20, 2002, Victor Anderson, a regulatory field agent with the USACE, entered onto Balch's property in order to investigate allegations of illegal filling. Anderson met with Bill Reavis, who was Balch's site manager and present at the time. Anderson told Reavis that the filling needed to stop and that Balch needed to call Anderson. Balch called Anderson later that day, and Anderson told Balch that he believed illegal filling was going on at the property and that it needed to stop. Balch told Anderson to contact his consultant, Johnson, and gave him the phone number. Balch also called Defendant Johnson to tell him what had happened and to give him a "heads-up" that Anderson might be calling, but Anderson never contacted Johnson.

Shortly thereafter, Defendant Johnson requested that Balch create a drawing that represented his progress and showed the placement of the fill on the bay bottom and fax it to him. Balch created a drawing of his property with marks indicating what areas already had been filled and what areas were still left to be filled. Balch then faxed this document to Johnson on February 28, 2002, from the fax machine in Balch's office.[2] Balch subsequently made a couple of phone calls

---

[2]This document was introduced into evidence by the government at Johnson's trial.

to ensure that Johnson received the fax, and approximately two or three days later, discussed the drawings with Johnson "in quite a bit of detail," as well as his plans for the dock and for a boat lift on the property.

On March 5, 2002, Ivette McGraw, who worked in the enforcement division of the USACE, called Johnson and told him that Balch was putting unauthorized fill into the water and needed to stop.[3]  The next day, Johnson spoke with McGraw and informed her that Balch had stopped putting fill in the water.  According to Balch, Johnson told him about the call from McGraw, but Johnson never told him to stop the filling or that the filling was illegal.  Consequently, Balch continued to put fill in the water because his fill project had not yet been completed.

On March 13, 2002, McGraw left a message for Johnson telling him that the unauthorized fill had continued and that Balch had to stop immediately.  McGraw also faxed a copy of a cease and desist order that had been issued for Balch.  Johnson called Balch and told him that McGraw still was concerned about the unauthorized fill.  Johnson wanted to know where Balch was on the project, and Balch informed him that he only had a couple of cement blocks to place and some leveling to finish.  Balch continued filling for a few more days after talking with

---

[3]On that same day, March 5, 2002, Anderson issued a cease and desist order to Balch, which was sent via certified mail.  However, the order was never retrieved from Balch's mailbox and was later returned.

Johnson. Meanwhile, on March 14, 2002, Anderson returned to the property, discovered that the unauthorized fill activity had continued, and issued another cease and desist order to Balch, which was personally served on Balch on March 20, 2002.

On March 18, 2002, Oswaldo Romero, Jr., a special agent in the U.S. Environmental Protection Agency ("EPA"), Criminal Investigation Division, opened an investigation into the unauthorized fill activity occurring on Balch's property. During the course of his investigation, Agent Romero contacted Johnson in an effort to get "a firsthand account of what had been going on" at Balch's property. However, Johnson told Agent Romero, among other things, that he had not learned about the unauthorized filling until he was contacted by McGraw on March 5, 2002, that he immediately contacted Balch and told him to stop, and that Balch stopped putting fill in the water after Johnson talked with him. When asked whether he had ever told Balch that he was entitled to fill in his property, Johnson stated that he had not done so, again claiming that he did not know about the filling until he was contacted by McGraw.

Balch subsequently was indicted for violating the Clean Water Act. Balch eventually pled guilty. Following his sentencing, Balch met with the government and discussed, inter alia, his conversations with Johnson concerning the fill

activity. In addition, Balch provided phone records to the government which indicated that Balch (1) called Johnson twice on February 20, 2002, the day of Anderson's inspection; (2) called Johnson once on February 21, 2002, and once on February 26, 2002; (3) sent a fax to Johnson on February 28, 2002, and also called him that day; and (4) called Johnson twice on March 1, 2002, talking with him for over twenty-six minutes total.

## B.    Johnson's Grand Jury Appearances

On September 3, 2003, Defendant Johnson was served with a subpoena to appear before a grand jury investigating Balch's alleged illegal fill activities. The subpoena also commanded Johnson to bring with him all records that he had pertaining to Balch and the property in Marathon in order to provide "a complete picture of everything that was going on on the property." Shortly thereafter, Defendant Johnson called Agent Romero, complaining that the subpoena was too broad and that he had "two drawers full of records." Agent Romero advised Defendant Johnson to box up the records and ship them ahead of time at the government's expense. During the conversation, Agent Romero also reviewed with Defendant Johnson the requirements of the subpoena and instructed him to bring any and all records he had, and not just the records Johnson deemed relevant.

On November 12, 2003, Defendant Johnson appeared before the grand jury in Key West, Florida. Before his testimony, Johnson met with Agent Romero and the prosecutor to discuss whether he had brought his records since he had not sent them ahead of time. Defendant Johnson produced four manilla folders that contained the documents he believed were relevant to the investigation. Agent Romero again explained to Johnson that the subpoena required the production of all his records, and Johnson was given a ten-day extension to produce the two boxes of records that he had told Romero about. Johnson was informed that he would likely have to appear before the grand jury again once his records were produced and reviewed.

During his first appearance before the grand jury on November 12, 2003, Defendant Johnson testified, inter alia, that (1) he received a call from McGraw on March 3, 2002,[4] in which she stated that there was illegal dumping of fill into the water on Balch's property; (2) prior to being contacted by McGraw, he had "no knowledge whatsoever" that fill was being placed in the water on Balch's property; (3) he contacted Balch and told him to stop the dumping; and (4) he never advised Balch to put fill in the water.

On December 2, 2003, Agent Romero received two boxes of documents

---

[4]Johnson later clarified during his second appearance before the grand jury that the call from McGraw occurred on March 5, 2002.

8

from Defendant Johnson that contained, among other things, (1) a copy of the February 28, 2002 fax from Balch containing a description of the areas of his property that were already filled and those areas that still needed to be filled; and (2) a notation on a legal pad, dated February 6 and February 8, 2002, which stated, "illegal dredge and fill . . . sovereign land, bay bottom issue, Jeff–felony."  When asked about these documents, Johnson stated that he had never seen the fax and was unsure what the notations meant.  Johnson also produced, prior to his second grand jury testimony, a folder containing notations from Johnson's conversations with McGraw.

On June 16, 2004, Defendant Johnson appeared before the grand jury for a second time and again testified that he had not discussed the filling of the bay bottom with Balch prior to his conversation with McGraw on March 5, 2002.  Johnson also testified that he had not talked with Balch about Anderson's February 20, 2002 investigation of the property until after his conversation with McGraw on March 5, 2002.  Finally, Johnson was asked about the February 28, 2002 fax from Balch that was recovered from his files and testified that he had no recollection of seeing the fax or dealing with it.

C.    **Johnson's Convictions**

On June 15, 2005, a federal grand jury returned a five-count indictment

charging Johnson with (1) two counts of endeavoring to obstruct the administration of justice by knowingly giving false testimony before a grand jury on November 12, 2003 (Count One) and June 16, 2004 (Count Two), in violation of 18 U.S.C. § 1503; and (2) two counts of knowingly making false material declarations before a grand jury on November 12, 2003 (Count Three) and June 16, 2004 (Count Four), in violation of 18 U.S.C. § 1623. The primary basis for Counts One through Four was Johnson's testimony that he did not know about Balch's illegal fill activity prior to being contacted by McGraw on March 5, 2002. Johnson also was charged with one count of making a false statement to the United States (Count Five), in violation of 18 U.S.C. § 1001, for stating to agents of the USACE that he was unaware of Balch's illegal fill activity prior to being contacted by McGraw on March 5, 2002.

Johnson proceeded to trial. At the close of the government's case, Johnson moved for a judgment of acquittal, arguing that the government had not proven the requisite elements of intent and materiality. The district court denied Johnson's motion. At the close of Johnson's defense, the district court also denied Johnson's renewed motion for a judgment of acquittal. The jury found Johnson guilty on all charges.

10

**D.      Sentencing**

A presentence investigation report ("PSI") recommended a base offense level of 14, pursuant to U.S.S.G. § 2J1.3(a), and a 3-level increase, pursuant to § 2J1.3(b)(2), because Johnson's perjury "resulted in substantial interference with the administration of justice." See U.S.S.G. § 2J1.3(b)(2). With a total offense level of 17 and a criminal history category of I, Johnson's advisory guidelines range was 24 to 30 months.

At sentencing, Johnson objected to the 3-level enhancement under § 2J1.3(b)(2), arguing, inter alia, that there was no evidence that his testimony before the grand jury resulted in the substantial expenditure of government resources. In response, the government argued that Johnson's perjury did result in the substantial expenditure of government resources, including: (1) the cost of convening the grand jury a second time; (2) travel costs involved in bringing everybody – Johnson, members of the grand jury, and prosecutors – back a second time; and (3) interviewing and subpoenaing other witnesses, in preparation for both the grand jury and for trial, in order to establish some of the facts that Johnson would have established had he testified truthfully.[5]

---

[5]The government acknowledged that it could not rely on the costs associated with the prosecution of Defendant Johnson or any investigative expenses incurred before Johnson's false testimony before the grand jury.

The district court overruled Johnson's objection, finding that Johnson's "materially false statements" to the grand jury, and his "shenanigans" with respect to the production of his records, substantially interfered with the government's ability to investigate the case, "made what could have and should have been a very straightforward case more difficult to pursue and investigate, and frustrated the due administration of justice . . . ."

Johnson also filed a motion for a downward departure, pursuant to U.S.S.G. §§ 5K2.0 and 5K2.20, based upon Johnson's old age, his poor health, and because his conduct constituted aberrant behavior. The district court denied the motion, finding unequivocally that it had the discretion to depart based on those factors, but concluding that a departure was not appropriate because Johnson's characteristics were not "outside the heartland of cases."

Finally, Johnson argued that a sentence of probation with 6 months of house arrest would be reasonable and sufficient to meet the purposes of 18 U.S.C. § 3553(a), given the factors cited in his motion for downward departure, the nature of the offense, and his lack of any criminal history. After considering Johnson's arguments and the factors in § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense and provide just punishment, the

district court concluded that a sentence within the advisory guidelines range was reasonable and sentenced Johnson to a total of 24 months' imprisonment and 2 years' supervised release.

Johnson now appeals his convictions and sentence.

## II. DISCUSSION

### A. Sufficiency of the Evidence

On appeal, Defendant Johnson argues that there was insufficient evidence to support his convictions because his false statements regarding the date on which he learned of Balch's illegal fill activity, especially in light of his other, truthful statements implicating Balch, were not material to any investigation and did not have the natural and probable effect of impeding justice. Accordingly, Johnson argues that the district court erred in denying his motion for judgment of acquittal as to all counts.[6]

In order to convict a defendant for obstruction of justice under the omnibus clause of 18 U.S.C. § 1503, "the government must prove that he (1) corruptly or by threats, (2) endeavored, (3) to influence, obstruct, or impede the due administration

---

[6]We review <u>de novo</u> the district court's denial of a motion for judgment of acquittal, viewing the facts and drawing all inferences in the light most favorable to the government. <u>United States v. Descent</u>, 292 F.3d 703, 706 (11th Cir. 2002). In order to affirm, "we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." <u>Id.</u> (quotation marks omitted).

of justice." United States v. Thomas, 916 F.2d 647, 651 (11th Cir. 1990). False testimony can provide the basis for a conviction under § 1503 so long as it had the "natural and probable effect" of interfering with the administration of justice, even though the defendant's conduct may not have actually obstructed justice. Id. at 651-52.

Likewise, a conviction for making false declarations before a grand jury, 18 U.S.C. § 1623, or to the United States, 18 U.S.C. § 1001, requires, in relevant part, that the false statement be material. A false statement is material "if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770, 108 S. Ct. 1537, 1546 (1988) (quotation marks omitted).

Here, Johnson repeatedly made false statements while testifying before the grand jury and while talking to Agent Romero concerning the important issue of when Johnson first knew about Balch's illegal fill activity. First, Johnson told Agent Romero, during the initial investigation into Balch's violation of the Clean Water Act, that he did not know about any unauthorized fill activity occurring on Balch's property until after he was contacted by McGraw on March 5, 2002. This false statement provided the basis for Johnson's conviction for making false statements to the United States (Count Five).

14

Johnson then made similar false statements concerning when he first learned of the illegal fill activity on Balch's property during his testimony before the grand jury on November 12, 2003, and June 16, 2004. Those false statements before the grand jury provided the bases for Johnson's convictions for endeavoring to obstruct the administration of justice (Counts One and Two), and for knowingly making false declarations before a grand jury (Counts Three and Four). There was ample evidence that these statements were knowingly false when made, including: (1) Balch's trial testimony regarding his communications with Johnson, and (2) documentary evidence, such as the February 28, 2002 fax from Balch, indicating that Johnson knew of Balch's illegal fill activity before March 5, 2002. Indeed, on appeal, Johnson does not seriously contest that he made false statements. Instead, Johnson argues that the statements were not material.

After a thorough review of the trial transcript and the parties' briefs, we conclude that the evidence presented at trial was more than sufficient for the jury to conclude, beyond a reasonable doubt, that Johnson's false statements to the grand jury and to Agent Romero were material and had the natural and probable effect of interfering with the administration of justice.

By falsely claiming to have not known about Balch's illegal fill activity until after he was contacted by McGraw on March 5, 2002, Johnson disrupted and

15

interfered with the investigation into Balch's violations of the Clean Water Act. Specifically, Johnson's false statements denied both Agent Romero and the grand jury access to a witness – i.e. Johnson – who had detailed, firsthand knowledge of Balch's pre-March 2002 activities, including Balch's preparations, plans, and rationale for his filling project. Johnson's lies denied Agent Romero and the grand jury access to this information and foreclosed further inquiry into Balch's illegal activities. Moreover, Johnson's false statements deprived Agent Romero and the grand jury of a complete picture of Balch's illegal fill activity, including Balch's knowledge or belief as to the legality of his actions. As a result, Johnson's false statements were material to the issue of Balch's knowledge and intent, and were capable of influencing the decision of whether the government should pursue civil, as opposed to criminal, sanctions against Balch.

Johnson emphasizes the fact that the government was still able to obtain an indictment of Balch and convict Balch. This result, however, does not change the fact that Johnson made materially false statements that were capable of interfering with the administration of justice and had a natural tendency to influence the government in its decisionmaking process. Thus, the evidence was sufficient for a reasonable fact-finder to find Johnson guilty beyond a reasonable doubt on all

counts, and we affirm his convictions.[7]

## B.     Substantial Interference with the Administration of Justice

Johnson next argues that the district court erred by imposing a 3-level increase to his offense level, pursuant to U.S.S.G. § 2J1.3(b)(2), after finding that Johnson's "perjury . . . resulted in substantial interference with the administration of justice."  U.S.S.G. § 2J1.3(b)(2).  The commentary to § 2J1.3 provides that "[s]ubstantial interference with the administration of justice" includes causing "the unnecessary expenditure of substantial governmental or court resources."  U.S.S.G. § 2J1.3 cmt. n.1.  Here, Johnson contends that his perjury did not result in the unnecessary expenditure of substantial governmental or court resources.[8]

Although we have not previously defined what constitutes the unnecessary expenditure of substantial governmental or court resources for purposes of applying § 2J1.3(b)(2), the government correctly recognized at sentencing that it could not rely on any investigative costs incurred prior to Johnson's false

---

[7]Johnson also argues that the district court erroneously responded to a question about obstruction of justice posed by the jury during deliberations.  We conclude, without further discussion, that this issue lacks merit as the district court merely referred the jury to its original instruction, which contained a correct statement of the law on the requirements for a conviction for obstruction of justice.

[8]The district court's factual determination that Johnson's perjury resulted in substantial interference with the administration of justice by causing the unnecessary expenditure of substantial governmental or court resources must be accepted unless clearly erroneous. See United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir.), cert. denied, 126 S. Ct. 812 (2005); see also United States v. Serafini, 233 F.3d 758, 771 (3d Cir. 2000); United States v. Sinclair, 109 F.3d 1527, 1539 (10th Cir. 1997).

17

testimony, see United States v. Leeper, 886 F.2d 293, 295 (11th Cir. 1989), or the expenses associated with prosecuting Johnson's underlying perjury offense, see United States v. Norris, 217 F.3d 262, 273 (5th Cir. 2000) (collecting cases). Moreover, we agree that "[t]he government need not particularize a specific number of hours expended by government employees to sustain the application of section 2J1.3(b)(2)'s enhancement." Norris, 217 F.3d at 273 (quotation marks omitted).

In this case, the government properly focused on expenses incurred during the investigation of Balch for violating the Clean Water Act that occurred after, and as a result of, Johnson's false testimony before the grand jury. The record indicates that the government expected Johnson to be able to provide a complete account of Balch's illegal fill activity because of his unique position as Balch's consultant throughout the dock project. However, because Johnson testified falsely before the grand jury about his knowledge of the illegal fill activity – testimony that was facilitated by his failure to produce all of his subpoenaed records – the government was required to conduct further investigation into Balch's conduct. Thus, the government was required to expend additional resources in order to identify and interview several other witnesses, such as truck drivers and neighbors, who could testify as to the timing of Balch's conduct.

18

Following this additional investigation, as well as a review of Johnson's records, the government then reconvened the grand jury. As a result, the government was required to again pay for travel expenses for members of the grand jury, prosecutors, and witnesses.

Given the record in this case, we cannot say that the district court's determination that Johnson's perjury resulted in the unnecessary expenditure of substantial governmental resources was clearly erroneous.[9] Accordingly, we affirm the application of the 3-level enhancement pursuant to § 2J1.3(b)(2).

**C.    Reasonableness of Johnson's Sentence**

Finally, Johnson argues that his 24-month sentence is unreasonable.[10] After United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), a district court, in determining a reasonable sentence, must consider the correctly calculated advisory guidelines range and the 18 U.S.C. § 3553(a) factors. See United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). We review the defendant's ultimate sentence for reasonableness in light of the § 3553(a) factors. United States v. Williams, 435

---

[9]In light of the above, we also reject Johnson's contention that the district court imposed the 3-level increase under § 2J1.3(b)(2) primarily based upon its displeasure with the arrogance Johnson displayed toward the government agents involved in the investigation of Balch.

[10]Johnson also argues that the district court erred in denying his U.S.S.G. §§ 5K2.0 and 5K2.20 motion for a downward departure. However, because the district court clearly recognized that it had the discretionary authority to depart, we lack jurisdiction to review its refusal to do so. See United States v. Dudley, 463 F.3d 1221, 1228 (11th Cir. 2006).

F.3d 1350, 1353 (11th Cir. 2006). This "[r]eview for reasonableness is deferential. . . . and when the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." Talley, 431 F.3d at 788. "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)." Id.

After review, we conclude that Johnson has not shown that his 24-month sentence is unreasonable. As discussed above, the district court correctly calculated Johnson's advisory guidelines range. The district court also indicated that it had considered several of the § 3553(a) factors, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense. In doing so, the district court acknowledged Johnson's arguments for a sentence below the advisory guidelines range, including concerns about Johnson's age and health, but concluded that a sentence within the advisory guidelines range was reasonable. Under the facts and circumstances of this case, we cannot say that Johnson's 24-month sentence, which is at the low end of the advisory guidelines range, is unreasonable.

**AFFIRMED.**