[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14798

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHRISTOPHER TAVORRIS WILKINS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cr-80032-RKA-1

_____

Before WILSON, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Christopher Wilkins appeals his convictions for witness tampering and his 210-month total prison sentence. He contends that the district court erred by denying his motion for judgment of acquittal based on insufficient evidence. He also argues that at sentencing the district court erred by enhancing his offense level under four Sentencing Guidelines provisions— U.S.S.G. §§ 2J1.2(b)(1)(B), 2J1.2(b)(2), 2J1.2(b)(3)(C), and 4A1.3— and abused its discretion by imposing an unreasonable sentence. After careful review, we affirm.

## I.

In addition to four gun and drug offenses, Wilkins was charged with two counts of witness tampering in violation of 18 U.S.C. § 1512(b). From February to September of 2018, according to the superseding indictment, Wilkins attempted "to influence, delay, and prevent" a government witness, "C.S.," from both testifying in a grand-jury investigation of Wilkins, in violation of 18 U.S.C. § 1512(b)(1) (Count 6), and speaking with federal law enforcement about potential federal crimes, in violation of 18 U.S.C. § 1512(b)(3) (Count 7).

Wilkins proceeded to a five-day trial, and the jury found him guilty on Counts 6 and 7 and on two counts of possession of a firearm after a felony conviction under 18 U.S.C. § 922(g)(1). The jury

acquitted him of possession of a firearm in furtherance of a drug-trafficking crime, conspiracy to possess with intent to distribute cocaine, and another § 922(g)(1) count.  After the verdict was read, Wilkins threw a chair towards the prosecutor as he yelled death threats and various expletives.  The district court denied Wilkins's motion for judgment of acquittal at the close of the government's case and his post-trial motion for acquittal or a new trial on Counts 6 and 7.  The court then sentenced Wilkins to a total of 210 months in prison.

## A.

At trial, the government presented testimony from C.S. and other evidence relating to her interactions with Wilkins.  According to C.S., she and Wilkins dated on and off over the years.  After Wilkins was released to a halfway house in May 2017, they began selling crack cocaine together.  She often carried a Taurus 9mm pistol, which Wilkins would sometimes hold, and they purchased ammunition together at a Walmart on one occasion.

In August 2017, C.S. threatened to expose Wilkins to police after finding out he was seeing her friend, G.H.  Wilkins told C.S. to "go get a black dress, ho[]," and that he "control[s] who lives or dies, bitch," which she understood to mean that he would kill her if she followed through.  Nonetheless, C.S. contacted the police in October 2017 because Wilkins was dating G.H.  C.S. met with Special Agent Sara Connors of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and showed her photos and videos of Wilkins holding guns and ammunition.  By that time, Wilkins

had been arrested for strangling G.H., and he has remained incarcerated since.  Later in October 2017, C.S. told a grand jury that Wilkins sold drugs while possessing a firearm, but she omitted her involvement in his drug dealing.

Around this time, Wilkins broke up with G.H. and told C.S. he loved her and wanted her back.  From jail, Wilkins called C.S. (using another inmate's account) and sent her letters, text messages, and emails.

During several recorded jail phone calls in February 2018, C.S. and Wilkins discussed the investigation into him.  At first, Wilkins was confident that the government had "no case" because the evidence was all "just hearsay."  When C.S. responded that the government had photos of him with guns and a video at Walmart, Wilkins offered false explanations he would tell a jury for why the evidence was not credible.  He explained that C.S. was central to the government's attempt to "conspire a case" because they lacked the guns or the drugs, and that "[w]ithout [her], there's nothing."  He urged her to claim ignorance, to not cooperate, to contact his sister, to get a lawyer, and to "change [her] number" and "leave the state" so "they can't come find you."  He stressed that she did not have to cooperate and that a grand jury would not indict "unless you go to the grand jury" with Agent Connors.

C.S. visited Wilkins in prison in March 2018 and then reduced her contact with Agent Connors, with the goal of potentially marrying Wilkins.  Meanwhile, Wilkins learned that G.H. had been cooperating with the government.    He sent C.S. a letter

threatening to "go after" G.H. and "her entire blood line," stating a "mess" was "coming her way" and that there was a "price behind everything." Later in the letter, he added, "If they had me on anything, you can best believe I would have been charged, meaning they wouldn't need you or [G.H.] lying ass statements. That's why you need to tighten up." C.S. interpreted this statement to mean that she should "stop listening to [the government]."

At some point, Agent Connors discovered C.S.'s continued communication with Wilkins and her involvement with Wilkins's crimes. As a result, Agent Connors executed a warrant and arrested C.S. for her participation in the drug and gun crimes. After retaining an attorney, C.S. decided to resume cooperating with the government.

By July 2018, Wilkins had learned that C.S. was cooperating with the government. In several threatening emails, he wrote to her, "are you cooperating with the government now? . . . is that what I paid you for to be a snitch?"; "I got all the documents of you talking, and im keeping track of everything . . . since its going like dis, I advise you to just leave the state"; and "those guys know what u filed, and told the agents . . . u cannot run or hide." According to C.S., she believed Wilkins was going to "send people after [her]," and she felt "scared." To secure her safety, the government relocated her to a new residence.

C.S. testified that Wilkins continued to send her threatening emails and messages throughout August and September of 2018. In one email, he wrote: "oh so your moving and think I wont find

you?  Yea my ppl will let me know exactly where you at.  So ill be at your door step to see my son . . . .  I can stop by yo dad house also.  Dat skinny bitch [Agent Connors] better duck think im not gonna push her shit backwards."  In another email, sent the next day, he wrote, "get outta florida why u can bruh. Why are you scared when u see my people?  They know whats up, and got all the paperwork.  Yea its best you leave bruh, becuz shit gonna hit the fan, and ah n[****] like me ready to do a life sentence bout my respect."

In addition to these emails, Wilkins wrote C.S. a letter warning of consequences if she was "against [him]":

> I got all your addresses. I know you moved, and I know how to get every new address location, just like I get all your paperwork off the internet. I know you cant leave the Southern District of Florida, which means I'll be right on your ass before Dec. 25, 2018. . . it's all gas, no breaks, when it comes to dis wilding shit.  So you better act right. . . I'm really starting to feel like you are against me, and if it's like dat, you will be put in the category of dem fuck n[*****] I'm a get when I catch them. So what's it gonna be?

C.S. testified that she understood "act right" to mean she better "stop talking" to ATF "or he's coming after [her]."  This letter, much like Wilkins's other threats, made C.S. feel "scared."

### B.

Using the 2018 Sentencing Guidelines Manual, Wilkins's presentence investigation report ("PSR") set his base offense level at 14 under U.S.S.G. § 2J1.2(a), the guideline for obstruction-of-justice offenses. The PSR then applied an 8-level increase for "causing or threatening to cause physical injury to a person," U.S.S.G. § 2J1.2(b)(1)(B), a 3-level increase for "substantial interference with the administration of justice," *id.* § 2J1.2(b)(2), and a 2-level increase because the offense was "otherwise extensive in scope, planning, or preparation," *id.* § 2J1.2(b)(3)(C), for a resulting total offense level of 27. Wilkins objected to each enhancement.

The PSR also chronicled Wilkins's extensive criminal history, which earned him 21 criminal-history points and a resulting criminal-history category of VI, the maximum category. Between arrests and convictions, Wilkins's criminal history depicted an adult life of near continuous criminal activity interrupted by only periods of incarceration.[1] The government, arguing that category VI still underrepresented Wilkins's criminal history, moved for the court to depart upward under U.S.S.G. § 4A1.3 or to vary upward under 18 U.S.C. § 3553(a).

At Wilkins's sentencing in December 2020, the district court overruled his objections to the PSR. First, the court found that the

---

[1] The PSR also documented numerous juvenile arrests and convictions, beginning at age 9, which did not add criminal-history points. The district court stated that it did not consider "any of the juvenile adjudications or criminal conduct in enhancing or sentencing the defendant."

trial evidence amply supported a finding that Wilkins "threaten[ed] to cause physical injury" to C.S.

Second, after hearing testimony from Agent Connors, the district court determined that Wilkins substantially interfered with the administration of justice by causing C.S. to stop cooperating with the government, which had to spend additional resources to secure her cooperation, and by causing the government to relocate C.S. in response to his threats. That C.S. also shared culpability, the court stated, did not "absolve Mr. Wilkins of his responsibility for these costs," and the court expressly found that C.S.'s refusal to cooperate was the result of Wilkins's improper interference.

And third, the district court found that the offense was otherwise "extensive" based on several factors: the duration of Wilkins's obstructive conduct (over seven months); the multi-faceted nature of Wilkins's pressure campaign, including the use of different media, subterfuge, and his sister; and Wilkins's own comments to C.S. about doing "more thinking & plotting . . . than you ever will in your life" and being "10 steps ahead . . . when it comes to laying on my enemies."

Turning to the government's motion, the district court granted a two-level upward departure under U.S.S.G. § 4A1.3 after hearing argument from the parties and personal statements by Wilkins. The court found that the criminal-history category substantially underrepresented both Wilkins's criminal history and the likelihood he will commit future crimes. Among other things, the court noted that Wilkins had earned eight extra criminal-history

points; had repeatedly committed new crimes upon release to probation from custody; had threatened to kill the prosecutor and others after the guilty verdict in this case; and had exhibited no acceptance of responsibility or remorse in his comments at sentencing. With the two-level increase, the guideline range became 210 to 262 months of imprisonment.

Ultimately, the district court sentenced Wilkins to serve a total of 210 months in prison. In explaining its chosen sentence, the court extensively analyzed the § 3553(a) factors. The court found that the nature of the conduct was extremely serious, that Wilkins was very likely to reoffend, potentially with violence, and that the only way to prevent him from committing new crimes was to imprison him. The court also cited the need for general deterrence and promoting respect for the law, explaining that there must be serious consequences for threatening women and witnesses in a federal criminal case.

Importantly, the district court made clear that its choice of sentence did not depend on its resolution of the guideline issues. Even if it had resolved the guideline issues in Wilkins's favor, the court stated, it would have imposed the same 210-month sentence as an upward variance because it was "the only appropriate sentence in this case." In the court's view, sentencing Wilkins within the lower guideline range would "create rather than avoid unwarranted sentencing disparities," given the severity of his "conduct, his criminal history, and the likelihood that he will commit future

crimes, the likelihood that he will commit future violent crimes." Wilkins now appeals.

## II.

We start with Wilkins's challenge to the sufficiency of the evidence to support his convictions for witness tampering. He contends that his communications with CS, when considered in the context of their romantic relationship and the investigation of her crimes as well as his, were not designed to persuade CS to do anything she had not already considered doing herself.

We review *de novo* whether sufficient evidence supports a conviction, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in support of the jury's verdict. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). The evidence is sufficient if "a reasonable jury could have found the defendant guilty beyond a reasonable doubt," *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008), even if it does not exclude every reasonable hypothesis of innocence, *United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005).

Section 1512(b) broadly prohibits the use or attempted use of "intimidation, threats, or corrupt persuasion" with the intent to impede the administration of justice. *United States v. Davis*, 854 F.3d 1276, 1292 (11th Cir. 2017); *see* 18 U.S.C. § 1512(b). As relevant here, it prohibits such conduct with the intent to (1) "influence, delay, or prevent the testimony of any person in an official

proceeding," and (2) "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense" or a violation of the conditions of release.   18 U.S.C. § 1512(b)(1), (3).

Persuasion is "corrupt" if it is "motivated by an improper purpose." *United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998).  It need not be accompanied by "the use of physical or economic threat." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1040 (11th Cir. 2000).  Whether a communication is a threat is a question of fact for the jury, provided "a reasonable recipient, familiar with the context of the communication would interpret it as a threat." *Davis*, 854 F.3d at 1293 (quotation marks omitted).  If that objective inquiry is satisfied, the jury is free to conclude that a defendant violated § 1512(b)(1) "[r]egardless of whether [the witness] actually felt threatened." *Id.*

Here, a reasonable jury could readily conclude that Wilkins was guilty beyond a reasonable doubt of both counts of witness tampering.  The government presented ample evidence and testimony that Wilkins used corrupt persuasion, intimidation, and threats with the intent to prevent C.S. from testifying against him before a grand jury and from cooperating with ATF in the investigation against him. *See* 18 U.S.C. § 1512(b)(1), (3).

In the light most favorable to the guilty verdict, the trial evidence shows that Wilkins began to corruptly persuade C.S. to not cooperate with the government in February 2018.  In several phone

calls, he urged C.S. repeatedly to cut off contact with the government, not out of concern for C.S. or her legal interests but because he believed she was a valuable witness against him and that a grand jury would not indict "unless you go to the grand jury" with Agent Connors. A jury could reasonably infer that Wilkins "was attempting with an improper motive to persuade [C.S.] not to talk to the [government]." *Shotts*, 145 F.3d at 1301.

Then, starting in July 2018, Wilkins escalated to intimidation tactics and threats of violence after learning that C.S. was cooperating with the government. Over several months and across different media, he called C.S. a "snitch" and warned that she was being watched and "cannot run or hide"; he said he was going to find her new address and was "ready to do a life sentence bout my respect"; and he stated he was coming after her if she did not "act right" and stop being "against me." C.S. interpreted these statements as threats to stop cooperating with the government or Wilkins would "com[e] after [her]" and harm her, and they made her feel scared. Likewise, the jury was free to conclude that a reasonable recipient, familiar with the context of the communication, would understand the statements as threats, whether C.S. actually felt threatened or not. *See Davis*, 854 F.3d at 1293.

Wilkins makes several arguments based on C.S.'s conduct and her state of mind, asserting that she was coerced more by the government than by Wilkins. But C.S.'s state of mind is not

20-14798                Opinion of the Court                13

relevant to whether Wilkins violated § 1512(b).[2] *See id.* at 1292–93. That Wilkins exploited his relationship with C.S. to help himself at her expense is no defense of his conduct. *See id.* (statements by a father to his nine-year-old daughter to not testify because "that'll make Daddy go to jail for a long time" were sufficient to establish corrupt persuasion under § 1512(b)). Nor was the government required to prove that Wilkins's witness-tampering campaign was successful. *See id.* (affirming a § 1512(b)(1) conviction "[r]egardless of whether [the victim] felt threatened"); *see also United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986) ("In determining whether a threat was intended to influence future conduct under 18 U.S.C. § 1512, it is the endeavor to bring about a forbidden result and not the success in actually achieving the result that is forbidden.").

For these reasons, sufficient evidence supported Wilkins's convictions for witness tampering. The district court properly denied the motion for judgment of acquittal.

_____

[2] Wilkins complains that it is unfair to permit the government to use threats of prosecution to encourage the cooperation of a reluctant witness, but he offers no authority suggesting that the government's conduct was either improper or relevant to the elements of the § 1512(b) offenses. *See, e.g.*, *United States v. Davis*, 854 F.3d 1276, 1291 (11th Cir. 2017) ("Davis cites no authority suggesting that the government cannot use the threat of prosecution to encourage cooperation, and courts that have considered this issue have concluded otherwise.").

## III.

Next, we consider Wilkins's challenges to the calculation of his guideline range. We generally review the district court's factual findings at sentencing for clear error and its application of those facts to justify a sentencing enhancement *de novo*. *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017). "We will not reverse a district court's factual finding unless we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted). The government has the burden of proving by a preponderance of the evidence disputed facts necessary to support a sentencing enhancement. *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013).

## A.

First, the district court did not clearly err in finding that Wilkins "threaten[ed] to cause physical injury to a person." *See* U.S.S.G. § 2J1.2(b)(1)(B). Even assuming the threat of violence was not "explicit," as Wilkins claims on appeal, it also was not obscure. When C.S. first raised going to the police about Wilkins, he not-so-subtly hinted at her funeral, telling her to "go get a black dress," and said that he "control[s] who lives or dies." Then, after learning that C.S. had been cooperating with the government, Wilkins indicated that he was having her followed, that he was coming after her, and that he was "ready to do a life sentence bout my respect." It was not clearly erroneous to construe these comments as threats to physically harm, even kill, C.S., to prevent her cooperation. We affirm the application of the § 2J1.2(b)(1)(B) enhancement.

## B.

We also affirm the district court's determination that Wilkins substantially interfered with the administration of justice for purposes of § 2J1.2(b)(2).[3]   According to § 2J1.2's commentary, "substantial interference with the administration of justice" includes "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2, cmt. n.1; *see United States v. Johnson*, 485 F.3d 1264, 1271–72 (11th Cir. 2007) (applying this commentary).

Wilkins has not shown that the district court clearly erred in finding that Wilkins's obstruction resulted in the unnecessary expenditure of substantial government resources. *See Johnson*, 485 F.3d at 1272.   First, the trial evidence supported the district court's finding that C.S. would not have ceased cooperating with the government but for Wilkins's criminally obstructive conduct.   Despite her feelings for Wilkins, C.S. had reached out to and was

---

[3] In his initial brief, Wilkins makes a single reference to "double counting," which is not sufficient to preserve the issue for review. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) ("[A] party seeking to raise a claim or issue on appeal must plainly and prominently so indicate."). His arguments in the reply brief come too late. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).   In any case, as the district court explained, the § 2J1.2(b)(2) enhancement does not double count conduct because the underlying § 1512(b) offenses can be committed without any resulting interference with the administration of justice.

cooperating with the government before Wilkins corruptly persuaded her to stop.

Second, the government offered evidence at sentencing showing that it incurred substantial unnecessary expenses because of Wilkins's witness tampering.  Agent Connors testified that the government would not have executed a search warrant against C.S. or prosecuted her had Wilkins not corruptly persuaded C.S. to stop cooperating with the government.  She further testified that the government paid to relocate C.S. in response to Wilkins's threats against her.  Wilkins does not dispute that these expenses were substantial.  Accordingly, the court did not err in applying the § 2J1.2(b)(2) enhancement.

## C.

Third, the district court did not clearly err in finding that the offense was "otherwise extensive in scope, planning, or preparation."  U.S.S.G. § 2J1.2(b)(3); *see United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006) (reviewing a similar "otherwise extensive" finding for clear error).  As the court noted, Wilkins's campaign to prevent C.S. from cooperating was multi-faceted and lasted for more than seven months.  He used different media to communicate with C.S., sometimes disguising his identity to evade detection by authorities.  Plus, his comments to C.S. reflect that he was extensively "plotting" while in jail and had engaged his "people," including his sister, to keep tabs on C.S.  Based on this record, we are not left with a definite and firm conviction that the court made a mistake in finding that Wilkins's criminal activity was

otherwise extensive.  We affirm the application of the § 2J1.2(b)(3) enhancement.

## D.

Finally, the district court did not err by applying a two-level increase to Wilkins's offense level under U.S.S.G. § 4A1.3.  Section 4A1.3 recommends an upward departure where "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1).  Usually, the court will depart to a higher criminal-history category, but where, as here, that category is the maximum of VI, the court may increase the offense level instead.  *See id.* § 4A1.3(a)(4)(B).

Here, the district court reasonably decided to depart upward under § 4A1.3.  *See United States v. Phillips*, 120 F.3d 227, 230, 232 (11th Cir. 1997) (reviewing the application of § 4A1.3 for an abuse of discretion).  Wilkins had 21 criminal-history points, which far exceeded the 13 points necessary for the maximum criminal-history category of VI.  *See United States v. Santos*, 93 F.3d 761, 763 (11th Cir. 1996) (affirming a two-level upward departure under § 4A1.3 where the defendant had 21 criminal-history points).  He also repeatedly violated the conditions of his probation, threatened to kill the prosecutor after the guilty verdict in this case, and exhibited no acceptance of responsibility or remorse in his comments at sentencing, all of which supported the court's determination that

Wilkins was highly likely to reoffend.[4] *Cf. United States v. Fayette*, 895 F.2d 1375, 1380 (11th Cir. 1990) (stating that post-plea offenses may "suggest the likelihood of recidivism and future criminal behavior" for purposes of § 4A1.3).  Wilkins has not shown that the court abused its discretion by applying a two-level increase under § 4A1.3.

## IV.

In the alternative, Wilkins's 210-month sentence was appropriate as an upward variance.  The district court expressly stated that, even if it had resolved the guideline issues in Wilkins's favor, it would have imposed the same 210-month sentence as an upward variance because it was "the only appropriate sentence in this case."  And it supported that statement with an extensive discussion of the facts of the case and the § 3553(a) factors.

"Where a district judge clearly states that he would impose the same sentence, even if he erred in calculating the guidelines, then any error in the calculation is harmless," so long as the sentence is substantively reasonable. *United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir. 2009); *see United States v. Goldman*, 953 F.3d

---

[4] Wilkins was charged separately for his post-verdict outburst. *See United States v. Wilkins*, no. 0:21-cr-60037-AMC-1 (S.D. Fla. Jan. 28, 2021).  He is awaiting trial as of the date of this opinion. *Id.* Beyond conclusory assertions, Wilkins makes no argument that it was improper for the court to consider this conduct for the limited purpose of evaluating his likelihood to reoffend under § 4A1.3 and § 3553(a).

1213, 1221 (11th Cir. 2020); *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006).

We examine whether the sentence is substantively reasonable under the totality of the circumstances and in light of the sentencing factors listed in 18 U.S.C. § 3553(a). *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014). The district court must impose a sentence "sufficient, but not greater than necessary to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2). The court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant, among other factors. 18 U.S.C. § 3553(a)(1).

We ordinarily will vacate a sentence "only if[] we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (*en banc*) (quotation marks omitted). The defendant bears the burden of showing that the sentence "is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015).

Here, any error in calculating the guideline range was harmless because the district court clearly stated that its choice of sentence did not depend on its resolution of the guideline issues, and the 210-month sentence is substantively reasonable. As the court explained, that sentence is supported by the serious nature of the offense conduct, Wilkins's lengthy and unrepentant criminal history, and the potential for his future criminal conduct to be violent, given his threats to C.S., G.H., and the prosecutor. The sentence also promotes the needs for general deterrence and promoting respect for the law by imposing serious consequences for threatening witnesses in a federal criminal case. We cannot say the 210-month sentence lies outside the range of reasonable sentences for this case. *See Irey*, 612 F.3d at 1190.

## V.

In sum, we affirm Wilkins's convictions for witness tampering under § 1512(b) because they are supported by sufficient evidence. We affirm Wilkins's 210-month sentence because the district court did not err in calculating the guideline range or even assuming it did, any error was harmless and the sentence is substantively reasonable.

**AFFIRMED.**